490 A.2d 806

David M. BARASCH, Consumer Advocate, Appellant,

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION,**
Philadelphia Electric Company, City of
Philadelphia, Appellees.

Supreme Court of Pennsylvania.

Argued Jan. 24, 1985.

Decided April 3, 1985.

Charles F. Hoffman, Marlane R. Chestnut, Harrisburg, for Public Utilities Com'n.

Walter R. Hall, II, David B. MacGregor, Philadelphia, for Philadelphia Elec. Co.

Martha W. Bush, Asst. City Sol., Philadelphia, for City of Philadelphia.

Steven P. Hershey, Philadelphia, for Consumer Educ. & Protection Assoc.

Jack J. Aloff, Philadelphia, pro se.

Jackie Ruttenberg, Philadelphia, Kenneth R. Pepperney and Charles J. Streiff, Pittsburgh, for U.S. Steel Corp.

Edward J. Riehl, Harrisburg, for P.A.I.E.U.G.

Irwin A. Popowsky, Asst. Consumer Advoc., Harrisburg, for appellant.

Before NIX, C.J., and LARSEN, FLAHERTY, McDER-MOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION OF THE COURT

LARSEN, Justice.

In this rate case appeal, David M. Barasch, Consumer Advocate, challenges the Commonwealth Court's order affirming the decision of the Pennsylvania Public Utility Commission (Commission) which included in the rate base of appellee, Philadelphia Electric Company (PECO), $39,083,-000 invested in nuclear fuel in process of refinement, conversion, enrichment and fabrication, (hereinafter nuclear fuel). For the reasons that follow, we affirm.

On July 29, 1981, PECO filed tariff revisions with the Commission seeking an increase in annual revenue to become effective September 27, 1981.[1] The Commission initiated an investigation into the lawfulness, reasonableness and justice of the then existing rates and the proposed rates. After hearings and arguments before an administrative law judge, it was recommended that an increase in annual revenues be permitted. Exceptions to the law

---

1. The Commission described PECO's filing as a request for "an increase in revenue from electric operations of approximately $344,463,-000 per year or 17.7% of adjusted base rate revenue including fuel, based upon a future test year ended March 31, 1982." 56 PUC 194 (1982).

judge's recommendation were filed with the Commission. Following a review of the testimony, exhibits, briefs and exceptions filed, the Commission found that PECO was entitled to an annual increase in base rates of approximately $221,708,000. Approved for inclusion in the rate base was $39,083,000 invested by PECO in nuclear fuel. The nuclear fuel was included in the rate base even though the Commission found that a major portion [2] of the fuel was for Limerick Unit No. 1, a plant 70–75% complete and not scheduled to be operating until 1985.[3] Acknowledging that efficient completion of the Limerick No. 1 plant was important to PECO and the public, the Commission stated:

> The courts of this Commonwealth and this Commission have recognized that a utility is entitled to a return on investment in property that is essential to the continued operation of the company in rendering service to its ratepayers. E.g., *Pa. P.U.C. v. Peoples Natural Gas Company,* 51 Pa.P.U.C. 385, 393 (1977); *Duquesne Light Co. v. Pa. P.U.C.,* 176 Pa.Superior Ct. 568, 107 A.2d 745 (1954); *City of Pittsburgh v. Pa. P.U.C.,* 171 Pa.Superior Ct. 187 [90 A.2d 607] (1952); *Erie City v. Public Service Commission,* 278 Pa. 512 [123 A. 471] (1924).

The Commission concluded:

> Based upon the particular circumstances of this case and our determination that Limerick Unit No. 1 is in the public interest and is to be completed in the near future, we are of the conviction that recovery of the investment in nuclear fuel in process, other than that associated with Limerick Unit No. 2,[4] is in the best interest of both the ratepayers and the Company. We find merit in PECO's argument that a guaranteed fuel supply and avoidance of

**2.** The Commission found that $24,505,000 of the total $39,083,000 investment in nuclear fuel was for the unfinished Limerick No. 1.

**3.** It had been previously determined that expeditious completion of Limerick Unit No. 1 was in the public interest. *Limerick Investigation,* I–80100341.

**4.** Investment in nuclear fuel for Limerick Unit No. 2 was not included in the rate base because that unit was only 30–40% completed and had a history of scheduling delays. The commission found it was too speculative to include the nuclear fuel for this site in the rate base.

spot market purchases benefits both current and future ratepayers.

56 PUC at p. 201.

The appellant appealed, inter alia,[5] this determination to the Commonwealth Court, arguing that the inclusion of PECO's investment in nuclear fuel in the rate base violated the well-settled legal requirement that property in the rate base must be "used and useful" in service to the public. *Bell Telephone Co. v. Pa. Public Utility Commission*, 47 Pa.Cmwlth. 614, 629, 408 A.2d 917, 925 (1979). The appellant argued that the nuclear fuel in question here was not used and useful in the public service and therefore, could not be included in PECO's rate base. The Commonwealth Court rejected appellant's arguments and stated:

> The record reveals that a guaranteed fuel supply benefits ratepayers because present acquisition of the fuel provides protection against potential increases plus it insures the future availability of the needed fuel supply. The evidence indicates that investment in future nuclear fuel provides adequate fuel reserves for the company's three nuclear facilities. Although the major portion ($24,-505,000) of the claim relates to Limerick Unit I, the investment could be used to fuel the other facilities that are currently in service.[6]

**5.** In the Commonwealth Court, an appeal from the Commission's order filed by William J. Green and the City of Philadelphia was consolidated with the appeal of the appellant Consumer Advocate. *Green v. Pennsylvania Public Utility Commission*, 81 Pa.Cmwlth. 55, 473 A.2d 209 (1984). The Court heard and decided several questions raised in the appeals before it, including: (a) inclusion in the rate base of certain costs of various types of construction work in progress; (b) consideration of PECO's poor and deteriorating financial condition; (c) allowance of an increase based upon future wage adjustment; (d) recovery of the cost of cancelling leases in 1985 for combustion turbine generating units which would then be obsolete; (e) the inclusion in the rate base of certain expenses involved in pollution control projects; and (f) approval of PECO's normalization of state income tax benefits. None of these questions are before us. The only issue raised in the appeal to this court is the propriety of the inclusion in the rate base of PECO's investment in nuclear fuel in process.

**6.** *Green v. Pennsylvania Public Utility Commission*, 81 Pa.Cmwlth. at 69, 473 A.2d at 217.

While appellant's appeal from the Commission's decision was pending in the Commonwealth Court, the legislature passed Act No. 335 of 1982 and it was signed into law by the governor on December 30, 1982. That Act provides:

Section 1. Title 66, act of November 25, 1970 (P.L. 707, No. 230), known as the Pennsylvania Consolidated Statutes, is amended by adding a section to read:

§ 1315. Limitation on consideration of certain costs for electric utilities.

Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or improve safety at existing facilities or as may be required to convert facilities to the utilization of coal, the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

Section 2. *This act shall be applicable to all proceedings pending before the Public Utility Commission and the courts at this time.* Nothing contained in this act shall be construed to modify or change existing law with regard to rate making treatment of investment in facilities of fixed utilities other than electric utilities. (Emphasis supplied).

Section 3. This act shall take effect immediately.

66 Pa.C.S.A. § 1315. Citing Section 1315, appellant incorporated into his argument before the Commonwealth Court the contention that inclusion of nuclear fuel in the rate base is clearly prohibited by the newly enacted statute. Appellant pointed to Section 2 of the Act to support his claim that the instant case was among the class of cases to which the Act applied.

Commonwealth Court declined to apply Act No. 335 of 1982 (66 Pa.C.S.A. § 1315) to the instant case, holding that it:

[i]s to be applied prospectively only and can have no impact on rates charged prior to its effective date.[7]

■ The scope of appellate review in Public Utility Commission cases is limited to a determination of whether constitutional rights have been violated, an error of law has been committed, or the Commission's findings and conclusions are not supported by substantial evidence. *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 285, 289, 433 A.2d 610, 613 (1981); *Carnegie Natural Gas v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 436, 438, 433 A.2d 938, 940 (1981).

"Our duty is to determine only whether or not the [Commission's] findings are supported by substantial evidence; we may not substitute our judgment for that of the [Commission] nor may we 'indulge in the processes of weighing evidence and resolving conflicting testimony.' *Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission,* 5 Pa.Cmwlth. 521, 525, 291 A.2d 545, 547 (1972)."

*Philadelphia Electric Co. v. Pennsylvania Public Utility Commission,* 61 Pa.Cmwlth. 325, 331, 433 A.2d 620, 624 (1981).

■ First, we consider the appellant's argument that the evidence in this case shows that by including the nuclear fuel in the rate base, the Commission violated the requirement that property included in the rate base must be both used and useful in serving the public. Appellant contends that nuclear fuel that will not be burned for at least three years is not used and useful.

Our review of the record in this case demonstrates that the Commission's determination is supported by substantial evidence. Without a guaranteed source of nuclear fuel, the ratepayers of today would not be presently enjoying the

7. *Id.* 473 A.2d at 217.

benefits of economical nuclear generation. Additionally, they would not be assured that this low cost energy would be available to meet future needs. This guarantee of a present and future nuclear fuel supply permits PECO to avoid expensive and unreliable spot market purchases.[8] The Commission's determination, affirmed by the Commonwealth Court, that the nuclear fuel in question is "used and useful" in the public service and that PECO's investment in that fuel involves present benefits to present ratepayers is supported by substantial evidence.[9]

8. In *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa.Super. 187, 199–209, 90 A.2d 607, 614–618 (1952), the Commission included in the rate base of Duquesne Light Co. certain coal mines owned and operated by the utility. Duquesne Light argued that ownership of the mines was necessary to insure a continuous supply of coal and to provide a strong bargaining position in buying coal on the open market. The Superior Court sustained the inclusion of the coal mines in the rate base concluding that the Commission's determination that the utility had met its burden to show that the coal mines were used and useful in the public service was within the Commission's discretion.

9. Thomas P. Hill, Jr., Supervisor of Tariff and Special Projects in the rate division of PECO, testified:

Q. Mr. Hill, why has the Company invested in this future nuclear fuel supply?

A. The Company is charged by law with the responsibility to serve its customers. In order to assure a continuing long-range supply of uranium for use with the Company's nuclear generating units, the Company contracts in advance for its needed uranium supply. This investment is made solely to provide the fuel necessary to meet service requirements of the company's customers. It is, therefore, the Company's position that the investment is not distinguishable from other utility assets which are committed to the utility's business and held for the benefit of customers. (Reproduced record, P. 472).

Q. Mr. Hill, why is it a prudent investment for the Company to invest in future uranium supply?

A. It is generally recognized that uranium is an increasingly scarce commodity and that its cost will accelerate at a rapid rate in the future. Acquisition of uranium rights at the present time, assures the Company of the availability of sufficient supply to maintain service operations with its lower cost nuclear facilities. Moreover, acquisition of such rights provides some protection against potential increases in uranium costs. The alternative for the Company is to acquire nuclear fuel on the open market at inflated prices with no assurance that needed supplies will be available even at exhorbitant prices. (Reproduced record, P. 492).

Next, we consider what effect, if any, Act No. 335 of 1982 (66 Pa.C.S.A. § 1315) has on the facts in this case. The appellee argues, and the Commonwealth Court held, that the provisions of the Act do not contain language clearly manifesting a legislative intent that it be applied retroactively; and therefore, without such clear language, the Act must be interpreted to operate prospectively only. *Green v. Pennsylvania Public Utility Commission, supra,* 81 Pa. Cmwlth. at 69, 473 A.2d at 217; 1 Pa.C.S.A. § 1926. The appellant, on the other hand, argues that Section 1315 does expressly apply to all cases that were pending before the courts at the time of its enactment.

■ Upon a review of the provisions of the statute, we conclude, contrary to the holding of Commonwealth Court, that Section 1315 applies to all cases that were pending in the courts at the time it was signed into law. The language of the Act is plain and unambiguous:

"This act shall be applicable to *all proceedings pending before* the Public Utility Commission and *the courts at this time."* Act No. 335 of 1982, § 2. (emphasis supplied).

Since the case *sub judice* was pending in the Commonwealth Court at the time Section 1315 was enacted into law, it falls within the class of pending cases to which the Act applies.

■ This conclusion, however, does not help appellant in his argument that the new act bars the inclusion of

Q. Are there any other reasons why, in your judgment, rate base inclusion of this investment is appropriate?

A. Yes. Puting these carrying costs on a current pay-as-you-go basis will reduce the amount of costs capitalized as part of the investment. This in turn results in a permanent reduction in the long term cost of the procured uranium. The benefits of this cost reduction are returned to customers through lower burn-up charges during use of the fuel. If the Company's rate base claim for this uranium supply investment is approved, the Company will terminate AFUDC accruals on this investment. The economic advantage of acquiring nuclear fuel in advance of need will then be passed on to our customers in the form of a lower cost of fuel through the current energy cost rate either now or in the future. (Reproduced record, P. 492).

PECO's investment in nuclear fuel in its rate base. Although the Act is applicable to all cases that were pending at the time of its enactment, its specific provisions do not apply to the facts in the present case. The prohibition contained in Section 1315 provides that *"the cost of construction or expansion of a facility ... shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility."* The Public Utility Code defines "facilities" as:

> "All the plant and equipment of public utility, including all tangible and intangible real and personal property without limitation, and any and all means and instrumentalities in any manner owned, operated, leased, licensed, used, controlled, furnished or supplied for, by, or in connection with, the business of any public utility...."

66 Pa.C.S.A. § 102. The words "plant" and "equipment" contained in the definition of "facilities," as set forth in the Code are themselves undefined by the Code. Hence, we are obliged to construe these terms "according to their common and approved usage" (Statutory Construction Act 1 Pa.C.S.A. § 1903(a)). "Plant" and "equipment" do not include, in common and ordinary usage, fuel burned by a utility to generate energy—even though the fuel be nuclear. Accordingly, investment in nuclear fuel does not come within the scope of the act's prohibitory provisions. Nuclear fuel is not a facility and investment in nuclear fuel is not a cost of construction or expansion of a facility.

The order of the Commonwealth Court is affirmed.

FLAHERTY, J., filed a dissenting opinion.

FLAHERTY, Justice, dissenting.

I agree with the majority that Section 1315, 66 Pa.C.S.A. § 1315, applies to this case, but because this statute became effective only when the case was before Commonwealth Court, no record has been developed before the Public Utility Commission on the applicability of § 1315 to nuclear fuel. We are not benefitted by any expert testimony or by the expert opinion of the Commission in determining wheth-

er nuclear material, a unique substance, can be compared with the traditional sources of energy, such as coal, oil and the like. It may be that the nuclear fuel manufacturing process, or the longevity of nuclear fuel, once manufactured and installed, would cause experts to view nuclear fuel as more a part of the construction of the facility than as a traditional fuel source.

In spite of the fact that the applicability of § 1315 to nuclear fuel is the main substantive issue in the case, the majority disposes of this issue rather summarily, in my view.

Whether the record would establish that nuclear fuel falls within the purview of § 1315 is the crucial question; indeed, the resolution of this question dictates the resolution of the case. Because no factual findings have been made by the Commission on the applicability of § 1315 to nuclear fuel, and there is no record to support any such finding by any tribunal, I would remand to the Commission so that a record can be developed which will enable us to make a more educated determination.